

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**01/22/2013**

| | | |
|---|---|---|
| IN RE: | § | **Case No. 12-31267** |
| **ANLOC, LLC,** | § | **Chapter 11** |
| Debtor(s). | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

Edward Talone Trust No. 1's Claim #22 is disallowed in its entirety. Edward Talone's Claim #23 is disallowed in its entirety. As set forth in more detail below, the claims are disallowed because they seek compensation for engineering services performed by unlicensed persons in violation of the Texas Engineering Practices Act.

## <u>Introduction</u>

This Memorandum Opinion concerns a dispute between Anloc, LLC (the Debtor) and Edward R. Talone (individually, "Talone" and together with the Edward Talone Trust No. 1, for which he serves as Trustee, the "Talone Plaintiffs"). Anloc hired Talone to perform various services in connection with its drilling operations. This dispute arises out of Talone's efforts to obtain compensation.

The dispute predates Anloc's bankruptcy filing. After the filing, the Talone Plaintiffs have attempted to collect compensation in multiple ways: (i) filing an adversary proceeding seeking a declaratory judgment that an employment contract conveyed equitable title to a portion of Anloc's interest in certain oil and gas leases[1]; (ii) filing an unsecured claim for the estimated value of the interests in the oil and gas leases the Talone Plaintiffs argue should have been

---

[1] The adversary proceeding began after Anloc removed the state court lawsuit filed by the Talone Plaintiffs against Anloc that sought recovery under breach of contract and quantum meruit theories. (Case No. 12-3216, ECF No. 1-1).

assigned to them pursuant to the same employment contract[2]; and, (iii) filing a secured proof of claim related to an M&M lien filed by Talone to secure compensation for services rendered.

This Memorandum Opinion resolves: (i) Anloc's Objections to Proof of Claim 22 (Edward Talone Trust No. 1) and Proof of Claim Number 23 (Edward R. Talone), (ECF No. 293); (ii) Anloc's Motion to Estimate Claims, (ECF No. 296); and, (iii) Talone's Motion to Estimate Claim Pursuant to § 502(c), (ECF No. 331). In resolving these motions, it is necessary to address the various theories of recovery put forth by the Talone Plaintiffs in the adversary proceeding.

## Background

Although the parties dispute many facts, few of the disputed facts are material to the outcome of these motions.

Anloc is a Texas Railroad Commission Operator which has been approved to operate crude oil and natural gas leases in Texas. (ECF No. 37 at 3).

In early 2009, Anloc entered into a Farmout Agreement with Direct Petroleum Exploration, Inc., the lessor of two oil and gas leases in Harris County, Texas (known individually as the "Warren" and "Colvin" leases, and together as the "Hockley Dome Leases"). (Case No. 12-3216, ECF No. 12 at 2, ECF No. 13 at 3). Pursuant to the Farmout Agreement, Anloc would earn interests in these oil and gas leases by meeting certain drilling requirements. (Case No. 12-3216, ECF No. 12 at 2, ECF No. 13 at 3).

---

[2] Some of these theories are mutually exclusive. If the employment contract did convey equitable title in the leases to the Talone Plaintiffs, then they would not have a claim against the estate for the value of those leases pursuant to the same employment contract.

In February 2009, Anloc entered into a "Participation Agreement" with Petrodome Energy, LLC.  In return for helping finance Anloc's drilling operations, Petrodome had the right to share in Anloc's earned interests in the oil and gas leases.

Anloc hired Talone to perform services in connection with these operations.  The initial employment agreement (entered into in either January or February 2009) was oral.  (Case No. 12-3216, ECF No. 12 at 2, ECF No. 13 at 3).  The exact terms of the contract, the exact services Talone was hired to perform, and whether Talone competently performed those services are disputed issues of fact.

Both parties acknowledge that (at some point) Talone was to receive as compensation a portion of the interests in oil and gas leases acquired by Anloc.[3]  The parties dispute exactly which form this interest was to take.  *Compare* (Case No. 12-3216, ECF No. 12 at 3) ("[I]n return for Talone working with ANLOC and providing those services Talone would receive and ANLOC would convey to him a ten percent (10%) carried working interest in all interests, including future interests, that ANLOC realized in the Hockley Dome Leases.") *with* (Case No. 12-3216, ECF No. 13 at 3) ("The precise interest to be assigned by Anloc to Talone in a given well would be a percentage of the net interest that Anloc ultimately owned in the well in question after all interests necessary for financing activities were granted and assigned.  As Anloc owned nothing more than the right to own an interest in wells (and certain surrounding acreage) as they were developed, this is all that Anloc could assign.  The agreement was limited to Anloc's wells developed in and around the Hockley Dome, and those developed on Anloc's High Island Block 19-S, Jefferson County, Texas lease.").

---

[3] Exhibit A attached to the Sharing Agreement (the written employment agreement) indicates that Talone was to earn interests in both the Hockley Dome leases and the High Island leases.  (Case No. 12-3216, ECF No. 12 at 27).

Anloc eventually obtained interests in several oil and gas leases as a result of its drilling operations.  In September 2009, Petrodome (Anloc's financial partner) sued Anloc over these interests.  In March 2010, Anloc was temporarily forced out as operator of these leases and its interests were temporarily terminated.  In November 2010, after a settlement in the Petrodome lawsuit, Anloc regained most of its interests in the leases (subject to ownership claims of additional parties connected to Anloc).

In the meantime, Talone continued to work for Anloc.  Eventually, Talone and Anloc executed a written employment contract to replace the oral agreement entered into in January or February of 2009.[4]  On January 5, 2010, Talone and Anloc executed the written employment contract known as the "Sharing Agreement."  (Case No. 12-3216; ECF No. 12 at 3, No. 13 at 4).[5]

Not long after execution of the Sharing Agreement, Anloc temporarily lost control of its interests in the oil and gas leases.  As a result, Talone's compensation as originally contemplated was not possible.  Talone alleges that, to rectify the problem, Anloc offered alternate compensation at the rate of $20,000.00 per month.

On April 15, 2010, Talone filed an Affidavit of Mechanic's Lien Oil and Mineral Property (hereinafter, "M&M lien").  (Case No. 12-3216; ECF No. 12 at 29-30).  The amount of the lien ($300,000.00) corresponds to approximately 15 months' work (mid-January 2009 to mid-April 2010) at the rate of $20,000.00 per month.

Anloc regained most of its lost interests by November 2010.  Although this made possible the original compensation agreement, the Talone plaintiffs never received an assignment

---

[4] Although the written contract is between Talone Trust and Anloc, it is signed by Talone as trustee for Talone Trust.  Talone, as before under the oral employment contract agreement, was to provide the services to Anloc.  Any interest in the oil and gas leases received as compensation, however, was to be assigned to Talone Trust.

[5] Although the Sharing Agreement is between Anloc and an entity known as "Talone Trust", the evidence indicates that the parties to the agreement understood that: (i) Talone was to provide the services to Anloc under the Sharing Agreement; and, (ii) Talone was to receive compensation for the services from Anloc (although the compensation may have been paid directly to the Talone Trust, for whom Talone served as trustee).

of any interest in the oil and gas leases.  In late 2010, Talone became aware that Anloc would not honor the terms of Sharing Agreement.

On December 22, 2010, Talone filed a copy of the Sharing Agreement in the real property records.  Talone acknowledges altering the Sharing Agreement prior to filing it by writing the phrase "This instrument acknowledged before me" beside the notary's stamp.  (ECF No. 381 at 54).

Anloc was involved in litigation with various other parties around the same time period. On January 11, 2011, the Talone Plaintiffs intervened in a state court lawsuit involving Anloc's interests in the oil and gas leases.  The Talone Plaintiffs asserted a breach of contract claim against Anloc (for refusing to assign the lease interests and for failure to pay the $300,000.00 secured by the M&M lien) as well as a claim for quantum meruit.  (Case No. 12-3216, ECF No. 1-1).

Anloc and the Talone Plaintiffs engaged in settlement negotiations after the intervention. Talone alleges that a settlement agreement was reached in principle and that, as a result, the parties executed a document known as the Assignment of Carried Working Interest.  The Assignment of Carried Working Interest purports to assign Talone Trust a 6% carried working interest in certain oil and gas leases.  (Case No. 12-3216, ECF No. 12 at 35). This document was only part of the alleged settlement agreement.  The parties were to execute mutual releases and Talone was to be reimbursed for his legal fees incurred.  (Case No. 12-3216, ECF No. 16-4 at 46) ("This was a settlement agreement we made—a verbal settlement agreement.  This was—and to me [Talone], the fact that [Coolures] made the assignment meant that [Coolures] was going through with the verbal agreement, which was also pay me the money he owed me on past oil, my legal fees, future oil payments coming in, et cetera.").

According to Talone, Anloc later breached this settlement agreement by suing him. Talone argues this does not affect the validity of the Assignment of Carried Working Interest, however, as Anloc already should have assigned these interests pursuant to the Sharing Agreement.  (Case No. 12-3216, ECF No. 16-4 at 46) ("The verbal agreement went by the wayside when he sued me.  I mean, there's no longer a verbal agreement.  That's why we went back to the 10 percent.  This just means he owes me four more.  It's a valid assignment that I didn't give up anything that he's not paid me the money.").  Despite the alleged settlement reached in principle, the state court lawsuit always remained active.  The Talone Plaintiffs' intervenor claims were eventually severed into a separate state court lawsuit.  (Case No. 12-3216, ECF No. 1-1 at 21).

There are validity issues with the Assignment of Carried Working Interest.  Instead of a normal signature, the phrase "Assignor, Anloc, llc/Michael Coolures" appears in block print at the bottom of the first page.  Although he later changed his testimony, Michael Coolures (Anloc's president) acknowledged in an affidavit that he wrote this phrase but argued that it was not intended to constitute his signature.  (Talone Ex. 15 at 2) ("When I wrote the words 'Assignor, Anloc, llc/Michael Coolures,' I was noting on the document that a signature block needed to be added if I was ever going to sign the document; I was not signing it, which is why I did not use my signature.").

On January 24, 2011, Talone filed the Assignment of Carried Working Interest with the Official Real Property Records of Harris County, Texas.  (Case No. 12-3216, ECF No. 12 at 36).  As with the Sharing Agreement, Talone acknowledges that he unilaterally altered the document prior to filing it.  (ECF No. 381 at 61).  Talone wrote the phrase "President Michael Coolures" just to the right of "Assignor, Anloc, llc/Michael Coolures."  (ECF No. 381 at 61).

Anloc's disputes with several parties continued over the course of the next year. Eventually, on February 16, 2012, an involuntary bankruptcy was filed against Anloc. (ECF No. 1). Neither Talone nor Talone Trust joined in filing the involuntary bankruptcy proceeding against Anloc. (ECF No. 1).

On April 20, 2012, the involuntary case was converted to a chapter 11. (ECF No. 41).

On April 27, 2012, Anloc removed the Talone Plaintiffs' state court lawsuit. (Case No. 12-3216, ECF No. 1).

On July 25, 2012, the Court granted a Motion to Approve Compromise under Rule 9019 in the main bankruptcy case. (ECF No. 234). This resolved many of the disputes over the oil and gas leases, but specifically left unimpaired the rights of the Talone Plaintiffs to claim either an ownership interest or a right to payment (and Anloc's ability to contest those claims). (ECF No. 234 at 3). In addition, the Court withheld from disbursement proceeds corresponding to the 10% disputed interest in case the Talone Plaintiffs' arguments succeeded.

On September 4, 2012, Talone Trust filed Claim #22, which is an unsecured claim in the amount of $6,156,205.00. (Claim's Register No. 22 at 1).[6] The amount of the claim represents the estimated value of a 10% carried working interest in the Hockley Dome and High Island leases (adjusted for missed payments owed to, and expenses chargeable to, such an interest holder). (Claim's Register No. 22 at 6). Talone alleges that this is the compensation owed to Talone Trust pursuant to the Sharing Agreement (that is, the oil and gas interests that Anloc promised to assign as compensation but did not).

---

[6] Again, the proof of claim and the adversary proceeding are mutually exclusive theories of recovery. The Talone Plaintiffs cannot both have a claim against the estate for the estimated value of a 10% carried working interest in the oil and gas leases and also be the recipients of a prepetition conveyance of a 10% carried working interest in the same leases.

Also on September 4, 2012, Talone filed Claim #23, which is a secured claim in the amount of $300,000.00. (Claim's Register No. 23 at 1).

On September 18, 2012, Anloc timely filed objections to these claims. (ECF No. 293). Shortly thereafter, Anloc filed a chapter 11 plan, a disclosure statement, and a motion to estimate the Talone Plaintiffs' claims (at a value of $0). (ECF Nos. 294-96).

On October 2, 2012, the Talone Plaintiffs filed a first amended petition in the removed adversary proceeding. (Case No. 12-3216, ECF No. 12). The amended petition seeks a declaratory judgment that the Sharing Agreement conveyed to Talone Trust equitable title to a 10% carried working interest in the Hockley Dome Leases and the High Island Lease. (Case No. 12-3216, ECF No. 12 at 7). The Talone Plaintiffs also brought numerous other causes of action, including breach of contract, quantum meruit, and fraud. (Case No. 12-3216, ECF No. 12 at 7-20). All of these additional causes of action revolve around the same dispute—Anloc's failure to compensate Talone for services performed. Anloc brought counterclaims against the Talone Plaintiffs for breach of contract, negligence, breach of fiduciary duty, trespass to try title, and declaratory judgment. (Case No. 12-3216, ECF No. 13).

On October 16, 2012, Anloc filed a Motion for Summary Judgment in the adversary proceeding. (Case No. 12-3216, ECF No. 16). Shortly thereafter, the parties agreed to abate the adversary proceeding pending resolution of the Talone Plaintiffs' claims in the main bankruptcy case. (Case No. 12-3216, ECF No. 19).[7]

---

[7] The reason specified for abatement was that the Court (in ruling on the motions to estimate and objections to claims) might also rule on issues that would directly impact the claims and counterclaims set forth in the adversary proceeding. (Case No. 12-3216, ECF No. 18 at 2) ("The parties believe that the Court's rulings on the pending Objections and Motions to Estimate will directly impact this adversary action. Because of this, the parties believe that abating this adversary action pending the Court's rulings on the pending Objections and Motions to Estimate is in the best interest of the parties because it will save the parties the time and expense of continuing to prosecute and defend the claims and counterclaims in the adversary action that may be decided by the Court's rulings."). By this statement, the parties appear to consent to having issues decided via a contested matter even if they would normally be resolved in an adversary proceeding (e.g., avoidance of prepetition transfers). Other courts have allowed such

On November 13 and 14, 2012, an evidentiary hearing was held on the motions to estimate and the objections to the Talone Plaintiffs' claims.  After the hearing, the Court announced a preliminary ruling but allowed the parties to submit additional briefing.  At a subsequent hearing on December 17, 2012, the Court announced its final ruling disallowing the Talone Plaintiffs' claims in their entirety.

This Memorandum Opinion describes in greater detail the basis of the ruling.

### Analysis

### I.   Prepetition Conveyances

The first issue that must be addressed is whether the Sharing Agreement and the Assignment of Carried Working Interest conveyed interests in the oil and gas leases to the Talone Plaintiffs.  The outcome may affect the Talone Plaintiffs' claims against the estate.

### a.   Sharing Agreement

The Sharing Agreement did not convey any interest to the Talone Plaintiffs.  The Sharing Agreement is an agreement to assign rights in the future in exchange for services to be rendered in the future.  (ECF No. 296 at 34) ("For [Talone Trust's] efforts, [Anloc] agrees to assign to [Talone Trust] on all leases taken by [Anloc] in the aforementioned Exhibits a Carried Working Interest (CWI) as described in those same Exhibits.") ("Such CWI will be assigned, recorded in the respective counties of production, and transferred to [Talone Trust] within thirty (30) days of initial sale of production.").  There is no indication in the Sharing Agreement of a present intent to pass title as required for a conveyance.  *See Young v. Rudd*, 226 S.W.2d 469 (Tex. Ct. App.—

---

waivers under similar circumstances.  *See, e.g.*, *In re Wilkinson*, 196 B.R. 311, 315 (Bankr. E.D. Va. 1996) ("The more formal requirements of an adversary proceeding are intended in large measure to protect the defendant, and the court concludes that, where no harm will result to the administration of justice, the defendant can waive those protections and consent to issues being adjudicated under the less formal procedures applicable to contested matters.").  The Bankruptcy Rules' adversary proceeding requirements are not jurisdictional.  *United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367, 1378 (2010).

Texarkana 1950) ("Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument, in a legal view, if the intention to pass the title can be discovered, the courts will give effect to it . . . .") (quoting *Harlowe v. Hudgins*, 84 Tex. 107, 111 (1892)); *see also* TEX. PROP. CODE § 5.022 (providing rubric for valid conveyance using the phrase "grant, sold, and conveyed").

Talone portrays the Sharing Agreement as a contract for the sale of real property.  (Case No. 12-3216, ECF No. 12 at 7) ("The Sharing Agreement is a contract for the sale of real property and Talone Trust became the owner of the equitable title to the ten percent (10%) carried working interest in the Hockley Dome Leases and the High Island Lease when the Sharing Agreement was executed."). The Sharing Agreement is not a contract for the sale of real property.  It is an employment contract pursuant to which, as compensation for services to be rendered in the future, Anloc agreed to assign interests in oil and gas leases to Talone Trust in the future.  Talone Trust may have a claim against the estate for the value of these interests. Talone Trust does not, however, have equitable title to a 10% carried working interest in these leases by virtue of the Sharing Agreement.

### b.  Assignment of Carried Working Interest

The Assignment of Carried Working Interest does contain conveyance language.  (ECF No. 293 at 25) ("ANLOC, L.L.C., . . . for good and valuable consideration . . . does hereby sell, transfer and assign unto EDWARD TALONE TRUST NO.1 . . . a six percent (6%) CARRIED WORKING INTERSET (defined below) in and to the following oil and gas leases . . . .").

The Assignment of Carried Working Interest is of questionable validity.  Instead of a normal signature, "Assignor, Anloc, llc/Michael Coolures" is written in block print at the bottom of the first page.  In addition, Talone acknowledges unilaterally altering the document by writing

"President Michael Coolures" on the bottom of the first page next to where "Assignor, Anloc, llc/Michael Coolures" appears.  (ECF No. 381 at 61).

The first issue is whether the document was signed.  If the document was unsigned, it conveyed no interest.  TEX. PROP. CODE § 5.021 ("A conveyance . . . . must be in writing and must be subscribed and delivered by the conveyor or by the conveyor's authorized agent in writing."); *see also Green v. Canon*, 33 S.W.3d 855, 858 (Tex. Ct. App.—Houston 2000) (equating "subscribed" to "signed and acknowledged").

Coolures signed the Assignment of Carried Working Interest by writing "Assignor, Anloc, llc/Michael Coolures" because he intended this mark to represent to Talone his approval and acceptance of the document.  *See Betts v. Betts*, 2012 Tex. App. LEXIS 5395 (Tex. Ct. App.—Houston July 10, 2012) (citing *Bustillos v. State*, 152 Tex. Crim. 275, 282, 213 S.W.2d 837, 841 (1948) ("To sign an instrument or document is to make any mark upon it in token of knowledge, approval, acceptance, or obligation.")).  Coolures's testimony that he wrote "Assignor, Anloc, llc/Michael Coolures" only to indicate the future placement of a signature block is simply not credible.[8]

Although signed by Coolures, the document was not properly acknowledged as being signed by Coolures on behalf of Anloc LLC.  The certificate of acknowledgement states only that it was acknowledged by Michael Coolures, not Michael Coolures on behalf of Anloc LLC. (Claim's Register #22 at 11).   Acknowledgments by corporate officers must note that the

---

[8] This is especially true given that Coolures at one point lied about writing the phrase at all, instead arguing that Talone fraudulently added the phrase after the fact.  Although Talone did add phrases to certain documents, the Court finds that Coolures wrote "Assignor, Anloc, llc/Michael Coolures."

document is being executed on behalf of that corporation.  TEX. CIV. PRACTICE & REMEDIES CODE § 121.008(b)(4).[9]

If "subscribed" is not defined as "signed and *acknowledged*," there is an argument that Texas Property Code § 5.021 does not require an acknowledgement for a proper conveyance. Even if this were true, it would not help Talone because this conveyance could not be properly recorded without the proper acknowledgment.  TEX. PROP. CODE § 12.001(b).[10]

Instruments unlawfully recorded do not create constructive notice.  *Hayden v. Moffat*, 74 Tex. 647, 650 (1889) ("If the certificate of acknowledgement does not state the facts essential to the conveyance, the registration of the instrument is illegal, and does not constitute notice."); *see also Tandy v. Dickinson*, 371 S.W.2d 81 (Tex. Ct. App.—Amarillo 1963) ("If [an instrument lacking the proper acknowledgment or proof] is recorded, it is not constructive notice.").

Once Anloc filed bankruptcy, this interest is subject to the strong-arm powers, particularly § 544(a)(3)[11]:

---

[9] If the document itself, excepting Talone's unilateral addition of "President Michael Coolures", clearly referenced Coolures's status as an officer of Anloc, LLC, the result might well be different.  *See Muller v. Boone*, 63 Tex. 91 (1885) (acknowledgement's failure to state "on behalf of corporation" not fatal where deed included corporation's seal and both the deed and the acknowledgment contained explicit references to signatory's status as corporation's president); *see also Toot'N Totum Food Stores, Inc. v. Williams*, 561 S.W.2d 937 (Tex. Ct. App.—Amarillo 1978) (not fatal under similar circumstances where application and acknowledgement explicitly stated the signatory was the corporate vice-president).

[10] Although section 12.001(b) states that the instrument may be "acknowledged or sworn" to a qualified officer, a proper acknowledgment is required here as the notary states only that the instrument was "acknowledged" before her, not that it was sworn to.  (Claim's Register No. 22 at 11).

[11] Talone may not argue that Anloc did not file a counterclaim in the adversary proceeding to avoid this conveyance to Talone under § 544(a)(3) and to recover the property under § 550.  If this is to be viewed as a procedural failing by Anloc, Talone is similarly guilty by failing to properly set forth this theory of recovery.  In the adversary proceeding's amended petition, Talone only requested a declaratory judgment that it received a conveyance of equitable title to a portion of the oil and gas interests pursuant to the Sharing Agreement (not the Assignment of Carried Working Interest).  The Court addressed both theories, however, as it considered that the parties' motions in the main bankruptcy case requested a final determination of the withheld proceeds attributable to a 10% carried working interest holder under all theories (whether set forth in the adversary proceeding or the main bankruptcy case contested matters).  At the hearing, all theories of ownership in the interests were addressed (including those originally brought in the adversary proceeding).  Additionally all issues surrounding the voidability and validity of

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by— . . . a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3).[12]  "Section 544(a)(3) allows the avoidance of a transfer of real property that is not perfected and enforceable against a bona fide purchaser at the time the bankruptcy petition is filed." *Realty Portfolio v. Hamilton (In re Hamilton)*, 125 F.3d 292 (5th Cir. 1997).

Although federal law (via the Bankruptcy Code) provides the debtor-in-possession the powers of a hypothetical bona fide purchaser, it is state law that defines the status of a hypothetical bona fide purchaser. *Hamilton*, 125 F.3d at 298. "Under Texas law, a 'bona fide purchaser is one who acquires (apparent) legal title to property in good faith for a valuable consideration without . . . notice of an infirmity in the tile.'" *Hamilton*, 125 F.3d at 298 (quoting *Williams v. Jennings*, 755 S.W.2d 874, 881 (Tex. App.—Houston 1988)).

Under Texas law, "[a] conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law." TEX. PROP. CODE § 13.001(a). The actual knowledge of the trustee (or the debtor-in-possession) is not relevant. 11 U.S.C. § 544 ("without regard to the knowledge of the trustee or of any creditor"). As a result, "the issue is therefore whether a hypothetical purchaser would be charged with implied knowledge of the [assignment], by

---

the Assignment of Carried Working Interest were addressed during the hearing and tried by implied (if not express) consent.

[12] In chapter 11 cases, the Bankruptcy Code allows debtors-in-possession the right to use these same strong-arm powers. 11 U.S.C. § 1107(a).

constructive or inquiry notice." *Hamilton*, 125 F.3d at 299. Otherwise Anloc, with the powers of a bona fide purchaser under Texas Property Code § 13.001(a), may avoid Talone's interest.

In Texas, "constructive notice is notice given by properly recorded instruments and charged to a person as a matter of law, regardless of the person's actual knowledge." *Hamilton*, 125 F.3d at 299 (citing *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981)); Tex. Prop. Code § 13.002). As discussed above, even assuming the instrument were a valid conveyance, it was recorded only because Talone altered the document to make it appear to be in recordable form. Accordingly, the document does not provide constructive notice under Texas law. Talone did not produce other documents capable of establishing constructive notice.

Inquiry notice is "triggered by notice of facts that would put a reasonably prudent person on a duty of inquiry." *Hamilton*, 125 F.3d at 299 (citing *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286, 289 (1951)). Unlike in *Hamilton*, there is no properly recorded deed of trust creating constructive notice, thereby putting a hypothetical purchaser on inquiry notice. 125 F.3d at 299-300.

Talone may not argue that this document, illegally recorded and incapable of constituting constructive notice, nevertheless creates a duty of inquiry for the hypothetical purchaser. This would allow Talone to profit from his wrong (the unilateral material alteration of the document). Talone testified that he added the phrase "President Michael Coolures" in order to get the County clerk to agree to file the document in the real property records.[13] Even if an unlawfully recorded

---

[13] Talone testified that the clerk told him to write "President Michael Coolures" on the Assignment of Carried Working Interest. (ECF No. 381 at 63). The Court understood the testimony to mean that the clerk informed Talone the Assignment of Carried Working Interest could not be filed in the real property records without this information. Talone testified that the clerk similarly instructed him as to the Sharing Agreement. (ECF No. 381 at 58) ("The Clerk there would—probably have made me go back and get it re-signed. At that time I doubt Michael Coolures would have re-signed the agreement. He probably would have tried to have got out of it. So the clerk told me you need to write ['This instrument was acknowledged before me'] on there. And she told me to.").

document might constitute inquiry notice under certain circumstances, where a creditor's wrongdoing is the proximate cause of the unlawful recording, the creditor should not be allowed to profit from the wrong. *See Pepper v. Litton*, 308 U.S. 295 (1939) (ruling that bankruptcy courts, in passing upon the validity and priority of claims, exercise equitable powers and have not only the power but the duty to disallow or subordinate claims if equity and fairness so require).

Talone has not produced any other documents, of which a hypothetical purchaser would have constructive notice under Texas law, that trigger a duty to inquire.  There are no documents of which a hypothetical purchaser has constructive notice, or which would create a duty to inquire, such that it would prevent the hypothetical purchaser as qualifying as a bona fide purchaser under Texas law.

The assignment to Talone is voidable as an unperfected interest in real property pursuant to § 544(a)(3) and § 13.001(a) of the Texas Property Code.  As Anloc may avoid the Assignment of Carried Working Interest via its § 544(a)(3) strong-arm powers, the Assignment: (i) does not serve to reduce the value of the Talone Plaintiffs' claims against the estate; and (ii) is avoided.

## II.  Claim #22

### a.  Disallowance under § 502(b)(1)

The Bankruptcy Code states that courts shall allow a claim "except to the extent that— such a claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent and or unmatured . . . ." 11 U.S.C. § 502(b)(1).

If applicable law prevents the Talone Plaintiffs from recovering compensation for the services performed, Anloc may use these laws to disallow the claims.

### b.  The Texas Engineering Practice Act

The Statement in Support of Proof of Claim accompanying Claim #22 states clearly that the debt is owed "by virtue of the Sharing Agreement."  (Claim's Register #22, at 4).[14]

The Texas Occupations Code regulates engineering and related practices.  *See* TEX. OCC. CODE §§ 1001.001 *et seq.* (hereinafter, "Texas Engineering Practice Act" or "TEPA").  The TEPA "shall be liberally construed to carry out the intent of the legislature."  TEX. OCC. CODE § 1001.004(d).  In addition, the TEPA shall "be strictly complied with and enforced."  TEX. OCC. CODE § 1001.004(c)(3).

Under TEPA, only a licensed person may: (i) engage in the practice of engineering; (ii) be represented in any way as any kind of "engineer"; or, (iii) make any professional use of the term "engineer".  TEX. OCC. CODE § 1001.004(c)(2)(A)-2(C).

Talone admits that he is not now, and has never been, a licensed engineer.  (ECF No. 381 at 50).

The TEPA prevents an unlicensed person from receiving compensation for the practice of engineering.  TEX. OCC. CODE § 1001.301(d) ("A person may not receive any fee or compensation or the promise of any fee or compensation for engaging in the practice of engineering unless the person holds a license under this chapter.").

The parties dispute whether Talone engaged in the "practice of engineering" as that phrase is defined by the TEPA.

### i.  Conclusive Presumption

Talone drafted the Sharing Agreement.  (ECF No. 381 at 49).  The Sharing Agreement begins: "WHEREAS [Talone Trust] is *in the business of petroleum engineering*, developing oil

---

[14] The same statement also acknowledges that other theories of recovery were set forth in the adversary proceeding. (Claim's Register No. 22 at 4).

and gas properties, and other interests related thereto . . . ." (ECF No. 296 at 34) (emphasis added).[15]

The TEPA forbids unlicensed people from using the designation "engineer" or variants thereof:

> Except as provided by Subsection (f), a person may not, unless the person holds a license issued under this chapter, directly or indirectly use or cause to be used as a professional, business, or commercial identification, title, name, representation, claim, asset, or means of advantage or benefit any of, or a variation or abbreviation of, the following terms:
>
> (1) "engineer"'
>
> (2) "professional engineer";
>
> (3) "licensed engineer";
>
> (4) "registered engineer";
>
> (5) "registered professional engineer";
>
> (6) "licensed professional engineer"; or,
>
> (7) "engineered"

TEX. OCC. CODE § 1001.301(b).  Talone's use of the phrase "in the business of petroleum engineering" in the Sharing Agreement (a violation of § 1001.301(b)) results in a conclusive presumption that Talone engaged in the practice of engineering.  TEX. OCC. CODE § 1001.301(e) ("A person, sole proprietorship, firm, partnership, association, or corporation that engages in or offers or attempts to engage in conduct described by this section is conclusively presumed to be engaged in the practice of engineering.").

---

[15] Although the Sharing Agreement is between Anloc and an entity known as "Talone Trust", the evidence indicates that the parties to the agreement understood that: (i) Talone was  to provide the services under the Sharing Agreement; (ii) Talone was to receive compensation for the services from Anloc (although the compensation may have been paid directly to the Talone Trust, for whom Talone served as trustee); (iii) that the reference to "petroleum engineering" is a reference to Talone himself being in the business of petroleum engineering; and, (iv) that Talone's petroleum engineering qualifications would be used to encourage financial investments in Anloc's operations.   Later references from the record will highlight these facts.

Even without the conclusive presumption, the Court would find that Talone engaged in the practice of engineering.  The TEPA broadly defines the "practice of engineering", which includes:

> (1)  consultation, investigation, evaluation, analysis, planning, engineering for program management, providing an expert engineering opinion or testimony, engineering for testing or evaluating materials for construction or other engineering use, and mapping;

> (2)  design, conceptual design, or conceptual design coordination of engineering works or systems;

> (3)  development or optimization of plans and specifications for engineering works or systems;

> (4)  planning the use or alteration of land or water or the design or analysis of works or systems for the use or alteration of land or water;

> (5)  responsible charge of engineering teaching or the teaching of engineering;

> (6)  performing an engineering survey or study;

> (7)  engineering for construction, alteration, or repair of real property;

> (8)  engineering for preparation of an operating or maintenance manual;

> (9)  engineering for review of the construction or installation of engineered works to monitor compliance with drawings or specifications;

> (10)  a service, design, analysis, or other work performed for a public or private entity in connection with a utility, structure, building, machine, equipment, process, system, work, project, or industrial or consumer product or equipment of a mechanical, electrical, electronic, chemical, hydraulic, pneumatic, geotechnical, or thermal nature;

> (11)  providing an engineering opinion or analysis related to a certificate of merit under Chapter 150, Civil Practice and Remedies Code; or

> (12)  any other professional service necessary for the planning, progress, or completion of an engineering service.

TEX. OCC. CODE § 1001.003(c).

The services Talone performed for Anloc constitute the "practice of engineering" as defined by the Texas legislature.

The Sharing Agreement describes the services to be provided as follows:

> [Talone Trust] agrees to provide technical well support specifically for logs, reservoir estimates and completions within the Area of Mutual Interest (AMI). [Talone Trust] will assist in developing a strategy for well activity based on risk, production potential, mechanical obstacles and lease acquisition to increase probability of success and rate of return on investment.  [Talone Trust] will be available for conversations concerning the above with investors and equity analysis.

(Claim's Register No. 22 at 5).

The Statement in Support of Proof of Claim filed with Claim #22 describes the services Talone provided for Anloc as follows:

> The services that Talone eventually provided to ANLOC, included, but were not limited to, supervision and technical assistance in finding prospect location, finding old well, preparing the site location for equipment, geology, well completion, clean up, well testing, well analysis and monitoring, production techniques, installing production equipment, water disposal, evaluating the prospect, assisting with reserve reports, arranging and supervising mudlogging, preparing production reports, working on completion strategies, preparing reserve decline graphics, developing a new well program, preparing AFEs, preparing cost estimates, and preparing for and attending numerous meetings with ANLOC's vendors, employees, investors, and potential investors.

(Claim's Register No. 22 at 4).[16]

It is clear that these services fall within the broad statutory definition as the practice of engineering.

Various services fall within the specifically defined categories of (1) through (11). Working on completion strategies, preparing reserve decline graphics, developing a new well program, and preparing cost estimates all fit under category 3 (development or optimization of plans and specifications for engineering works or systems) as well as category 2 (design, conceptual design, or conceptual design coordination of engineering works or systems).

---

[16] This statement by Talone is evidence that it was Talone who provided the services and met with potential financial investors on behalf of Anloc.

According to Talone's own testimony, all services related to drilling the wells (such as well completion and installing production equipment) would fall under category 4 (planning the use or alteration of land or water or the design or analysis of works or systems for the use or alteration of land or water).  (ECF No. 381 at 16-17).

In addition, each service satisfies the "catch-all" category 12 as professional services necessary for the planning, progress, or completion of an engineering service.  At the November 2012 evidentiary hearing, Talone testified that the services he provided were necessary for the petroleum engineers to properly complete their tasks.  (ECF No. 381 at 28-31).

Although not relevant for TEPA purposes, Talone himself defined the work he performed for Anloc as engineering.  The following exchange occurred during Talone's June 2012 deposition:

> **[Anloc's counsel]** And the engineering—what is the engineering involved in putting together a lease package?
>
> **[Talone]** Well you have to – you have to put together the cost of the wells. You got to show the depths of the wells.  You got to show reservoirs and how they produce.  That's all technical work.

(Case No. 12-3216, ECF No. 16-4 at 18).  Included amongst the list of services provided for Anloc are: (i) technical assistance; (ii) assisting with reservoir reports; (iii) preparing production reports; (iv) preparing cost estimates; and, (v) preparing reserve decline graphics.  (Claim's Register No. 22 at 4).

The TEPA prevents Talone from collecting compensation under the Sharing Agreement, as unlicensed individuals may not receive compensation for the practice of engineering.  TEX. OCC. CODE § 1001.301(d).

### ii.  Possible TEPA Exemptions

Talone argues for various TEPA exemptions, which would entitle him to receive compensation under the Sharing Agreement despite being an unlicensed engineer.

TEPA exemptions apply "only to a person who does not offer to the public to perform engineering services."  TEX. OCC. CODE § 1001.051.

Talone authored the Sharing Agreement, specifically choosing language describing himself as a petroleum engineer.  Coolures testified that Talone repeatedly represented to Anloc and potential financial investors that he was a licensed petroleum engineer (or had been a licensed petroleum engineer at one time and merely let the license lapse).  (ECF No. 381 at 108-11).  Talone's explanation for using the phrase "in the business of petroleum engineering" in the Sharing Agreement corroborates Coolures's accusation:

> I wrote ["in the business of petroleum engineering"].  And Mike Coolures at that time had to raise money immediately to get a rig out on location.  And I had to make presentations to companies who had petroleum engineers that were going to be interrogating me about this property.  That's what he needed.  He needed somebody that understood and had worked with petroleum engineers all his life; that's me.  And I had been in the petroleum engineering business all my life.

(ECF No. 381 at 51).[17]

Even setting aside Talone's representations through the Sharing Agreement itself (a document filed in the public records), the evidence indicates that Talone (on behalf of Anloc) sought out financial investors.  In order to encourage investment, Talone represented to the potential investors that an experienced and qualified petroleum engineer (himself) was involved with the drilling operations.  Given the codified legislative intent that TEPA be liberally

---

[17] This statement by Talone acknowledges that the Sharing Agreement contemplated that Talone would render the services to Anloc and that the parties, in discussions with potential financial backers, would highlight Talone's petroleum engineering experience in order to encourage investment.

construed, the Court finds that Talone informed the public that he was to perform engineering services (and is therefore prohibited from using any TEPA exemptions). Talone used the promise of performance of his engineering services to induce financial investments from the public.

Even if the TEPA did not categorically preclude Talone from using the exemptions, the exemptions selected by Talone (§§ 1001.052, 1001.057, and 1001.059) are not applicable.

### 1. Section 1001.052

Section 1001.052 states: "A person who is an employee or subordinate of an engineer is exempt from the licensing requirements of this chapter if the person's practice does not include responsible charge of design or supervision." TEX. OCC. CODE § 1001.052. Talone argues that he is entitled to this exemption as a subordinate of the drilling engineers, who were themselves responsible for drilling the wells. (ECF No. 395 at 16).

Section 1001.052 is inapplicable for two reasons.

First, the TEPA defines "engineer" as "a person licensed to engage in the practice of engineering in this state." TEX. OCC. CODE § 1001.002(2). For § 1001.052 to be applicable, the person must be the employee or subordinate of a *licensed* engineer. Talone put forth no evidence that he was the employee or subordinate of a licensed engineer.

Second, there is evidence that Talone's duties included work as a supervisor. In fact, Talone submitted an affidavit attesting to such in connection with the M&M lien he filed (that forms the basis of Claim #23). (Anloc Ex. 15 at 1).

### 2. Section 1001.057

Section 1001.057 states:

> This chapter shall not be construed to apply to the activities of a private
> corporation or other business entity, or the activities of the full-time

employees or other personnel under the direct supervision and control of the business entity, on or in connection with:

(1) reasonable modifications to existing buildings, facilities, or other fixtures to real property not accessible to the general public and which are owned, leased, or otherwise occupied by the entity; or,

(2) activities related only to the research, development, design, fabrication, production, assembly, integration, or service of products manufactured by the entity.

TEX. OCC. CODE § 1001.057(a).  Talone misconstrues the extent of this exemption, arguing that it exempts *all* activities of full-time employees or other personnel under the direct supervision and control of the business entity.  (ECF No. 395 at 17) ("The Engineering Act specifically exempts the activities of a private corporation or business entity [ANLOC]; or, full-time employees or 'other personnel' [Talone] who are under the direct supervision and control of the business entity.  This exemption applies to Talone.").  Section 1001.057 applies to certain activities of full-time employees or other personnel under the direct supervision and control of the business entity, hence the phrase "on or in connection with."

Even if the exemption were as Talone argues, it is still inapplicable.  Talone represented to Anloc that he was legally qualified to engage in the practice of engineering, and as a result is currently prevented from using this exemption.  TEX. OCC. CODE § 1001.057(b) ("A person who claims an exemption under this section and who is determined to have directly or indirectly represented the person as legally qualified to engage in the practice of engineering or who is determined to have violated Section 1001.301 may not claim an exemption until the 10th anniversary of the date the person made that representation.").

### 3.  Section 1001.059

Section 1001.059 states: "A qualified scientist engaged in scientific research and investigation of the physical or natural sciences is exempt from the licensing requirements of this

chapter.  This exemption includes the usual work and activities of a meteorologist, seismologist, geologist, chemist, geochemist, physicist, or geophysicist."  TEX. OCC. CODE § 1001.059.

Talone's argument that this exemption applies is simply another way of arguing that Talone did not engage in the practice of engineering.  First, because of Talone's use of a variant of the word "engineer", there is a conclusive presumption that he engaged in the practice of engineering (and is therefore not protected by § 1001.059).  Second, irrespective of the conclusive presumption, this Court found that Talone engaged in the practice of engineering. Therefore, although Talone might have performed some activities that would qualify as the normal work of a physicist, his services under the Sharing Agreement were not limited to such activities. As a result, § 1001.059 does not provide an exemption.

### c.  Claim Disallowed

The TEPA prevents the Talone Plaintiffs from collecting compensation under the Sharing Agreement.  As the Talone Plaintiffs' claim is unenforceable under applicable Texas law, it is disallowed pursuant to § 502(b)(1).

## III. Claim #23

### a.  Disallowance Under 502(b)(1)

Claim #23 relates to the M&M lien filed by Talone on April 15, 2010.  Claim #23 purports to be a secured claim in the amount of $300,000.00.  (Claim's Register No. 23 at 1).

The Bankruptcy Code states that courts shall allow a claim "except to the extent that— such a claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent and or unmatured . . . ." 11 U.S.C. § 502(b)(1).

If applicable law prevents Talone from collecting compensation for services rendered, Claim #23 will be disallowed under § 502(b)(1).  If the underlying claim is disallowed, the lien securing Claim #23 will be void.  11 U.S.C. § 506(d) ("To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . .").

### b.  Texas Engineering Practice Act

As he is not a licensed engineer, the TEPA prevents Talone from receiving compensation for the practice of engineering.  TEX. OCC. CODE § 1001.003(d).

The affidavit filed in support of the M&M lien states that "Edward R. Talone[] claims a lien for labor performed and services rendered under an express contract with, Anloc, LLC . . . ." (Claim's Register No. 23 at 4).[18]  The time period covered by the affidavit is from January 2009 until March 2010.  The employment contract was a verbal agreement from January 2009 until the Sharing Agreement was executed in January 2010.  Talone himself acknowledged that the services listed in the Sharing Agreement were the same services he agreed to provide under the verbal employment agreement.  (Claim's Register No. 22 at 4) ("The services that Anloc sought from Talone were agreed upon verbally and were later described in the Sharing Agreement.").

Similarly, the following statement (included with the Statement in Support of Proof of Claim for Claim #22) would accurately describe the services provided to Anloc under the verbal employment agreement as well as the services provided pursuant to the Sharing Agreement:

> The services that Talone eventually provided to ANLOC, included, but were not limited to, supervision and technical assistance in finding prospect location, finding old well, preparing the site location for equipment, geology, well completion, clean up, well testing, well analysis and monitoring, production techniques, installing production equipment, water disposal, evaluating the prospect, assisting with reserve reports,

---

[18] This is another piece of evidence demonstrating that, while the Sharing Agreement was executed between Talone Trust and Anloc, at all times it was Talone who provided the services (and Talone who expected to be compensated for performing those services).

arranging and supervising mudlogging, preparing production reports, working on completion strategies, preparing reserve decline graphics, developing a new well program, preparing AFEs, preparing cost estimates, and preparing for and attending numerous meetings with ANLOC's vendors, employees, investors, and potential investors.

(Claim's Register No. 22 at 4).[19]

For the reasons described above, the TEPA prevents Talone as an unlicensed person from receiving compensation under either employment agreement (as the services constitute the "practice of engineering."). Similarly, Talone is not entitled to any TEPA exemptions because: (i) the exemptions he argues for are not applicable; and, (ii) even if they were applicable, Talone is prevented from using the exemptions because of his public offer to perform engineering services.

### c.  Claim #23 Disallowed

The TEPA therefore prevents Talone from receiving compensation for these services.[20] Therefore, Claim #23 is disallowed under § 502(b)(1).

As the M&M lien secures a claim which is not an allowed secured claim, the M&M lien is void pursuant to § 506(d).

### Conclusion

The Court will issue a separate order in accordance with this Memorandum Opinion.

SIGNED **January 22, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[19] This statement by Talone is evidence that it was Talone who provided the services and met with potential financial investors on behalf of Anloc.

[20] Although TEPA prevents the Talone Plaintiffs from receiving compensation for these services, it is not necessarily true that the TEPA prevents the Talone Plaintiffs from offsetting any affirmative recovery Anloc might seek if the counterclaims in the adversary proceeding are not dismissed. The Court presently expresses no view on this question.